**Richard M. ROSS and Jane Spaulder Ross, Plaintiffs,**

v.

**COMMUNICATION INTELLIGENCE CORPORATION, Defendant.**

**No. 02 Civ. 6197(VM).**

United States District Court,
S.D. New York.

July 9, 2003.

John Halebian, Wechsler, Harwood, L.L.P., New York, for plaintiffs.

Richard L. Cys, Davis Wright Tremaine, LLP, Washington, DC, for defendant.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiffs Richard M. Ross ("Mr.Ross") and Jane Spaulder Ross ("Mrs. Ross," and together with Mr. Ross, "Plaintiffs") filed a complaint (the "Complaint") in this action against Defendant Communication Intelligence Corporation ("CIC"), alleging that CIC wrongfully advised Charles Schwab & Co. ("Schwab") that certain securities issued to Mr. Ross were restricted from being immediately sold, and that this inaccurate advice prevented Schwab from promptly selling the securities, thereby causing a significant loss for Plaintiffs. Plaintiffs invoked the Court's subject matter jurisdiction over the case under 28 U.S.C. § 1332 ("" § 1332) by virtue of diversity of citizenship.

Plaintiffs also initiated an arbitration proceeding against Schwab on June 10, 2001 (the "Arbitration"), asserting claims for monetary damages caused by Schwab's alleged improper and negligent processing and sale of the same securities referenced in the Complaint. On August 27, 2001, Schwab responded to Plaintiffs' allegations in the Arbitration with a Statement of Answer, Motion to Dismiss, and Cross–Claim against CIC (the "Response").

In response to the Complaint, CIC filed a motion (the "Motion") to dismiss pursuant to Rule 12(b)(1) and (2) of the Federal Rules of Civil Procedure, or in the alternative, to stay the proceedings pending a resolution in the Arbitration between Plaintiffs and Schwab. On December 13, 2002, the Court held an evidentiary hearing (the "Hearing") related to the issues of subject matter jurisdiction raised in the Motion, specifically whether the $75,000 amount in controversy threshold required by § 1332 for exercise of federal jurisdiction in diversity cases is satisfied under the circumstances presented by this case. The parties subsequently engaged in further discovery to supplement the record. In a letter to the Court dated April 15, 2003, the parties agreed to limit the Court's review of the Motion, as an initial matter, to only discuss the issue of subject matter jurisdiction pursuant to Rule 12(b)(1). The Court approved this agreement by memo endorsement, dated April 16, 2003.

By Order dated June 20, 2003, the Court granted the Motion, and indicated that its findings, reasoning and conclusions would be set forth in a separate Decision and

Order to be made available to the parties. Accordingly, for the reasons discussed below, the Motion is GRANTED.

## I. *FACTS*

Investors in securities markets learn quickly about the volatility of stock prices and the vagaries of financial fortunes. Within a matter of weeks, days, and even mere hours, stock prices can rise and fall, at times enhancing fortunes, and sometimes just as facily and fleetingly creating mayfly millionaires or altogether erasing hard-earned savings. The Complaint at bar involves such a situation. In 1994, Mr. Ross became a limited partner in CIC Standby Ventures LP Partners, a partnership that invested in CIC. On Friday, March 3, 2000, Plaintiffs received a stock certificate (the "Certificate") representing 72,463 [1] restricted shares of CIC stock (the "Shares").[2]

Because the Shares were restricted, the Certificate contained a legend identifying that fact and noting that the Shares could be offered, sold or transferred only if they were either registered with the Securities and Exchange Commission ("SEC") or delivered with an opinion of counsel stating a reason that the Shares were exempt from registration. A letter that accompanied the Certificate, dated February 23, 2000 (the "Letter"), identified one such exemption applicable to the Shares: Rule 144 of the Securities Act of 1933, as amended, which allows immediate public resale of restricted securities if certain conditions are met.

On Monday, March 6, 2000, Mrs. Ross brought the Certificate to a Schwab branch office in order to sell the Shares pursuant to Rule 144. On that day, each Share was worth $10.75, meaning the Shares in total were valued at $778,977.25. While at the branch office, Mrs. Ross deposited the Certificate with Schwab, and was allegedly told by a Schwab representative that, assuming the proper paperwork was completed, the Shares could be sold in a matter of days. Schwab and Plaintiffs agree that Mrs. Ross was provided with forms pursuant to Rule 144 (the "Forms") to complete that day for the purpose of selling the Shares, but the parties disagree as to whether she was given the appropriate forms. Plaintiffs claim that Schwab gave Mrs. Ross the wrong forms, which she then filled out and submitted to Schwab, while Schwab contends that Mrs. Ross did not properly complete the Forms she received and omitted certain material information on the Forms.

Two days later, on March 8, Mrs. Ross called Schwab's Restricted Stock Services department to inquire about the status of the Shares, and whether she had approval to sell them. Schwab contends that a Schwab representative told Mrs. Ross that it could take several weeks for Schwab to secure the approval of CIC's counsel to sell the shares.

According to Mrs. Ross, over the next two weeks she spoke to a variety of Schwab representatives regarding the status of the requested sale, and received "contradictory and confusing responses . . . ranging from, it should be taken care of shortly to we are unable to locate the certificate." (Statement of Claims, dated July 10, 2001, attached as Exhibit A1 to

---

1. The papers filed by the parties disagree on the number of shares Plaintiffs received. CIC claims the number to be 73,463, while Plaintiffs allege it is 72,463. Because the difference is irrelevant to the Court's final decision, the Court ignores the discrepancy and accepts Plaintiff's number as the valid one for the purposes of deciding the Motion.

2. Restricted securities are securities acquired in unregistered, private sales directly or indirectly from the issuer or from an affiliate of the issuer. *See* 17 CFR § 230.144(a)(3) (2003).

Notice of Motion to Dismiss, or in the Alternative, For a Stay Pending Arbitration, dated October 24, 2002 ("Notice"), at 4.) Mrs. Ross even contends that around March 17, she asked if the Certificate could be returned to her, but was told by a Schwab employee "that he was unable to comply with this request, because he could not locate the certificate." (Id.) Mr. Ross claims he received similar responses to his inquiries about the status of the sale when he contacted Schwab between approximately March 13 and April 3.(Id.) ("[Mr. Ross] was alternately told that he could sell all of the shares and that he could not sell all of the shares, without any coherent explanation for either alternative answer.")

By Thursday, March 23, the Shares still had not been sold, and Schwab claims that it was not until this day that Plaintiffs finally provided the missing information for the Forms that would enable Schwab to sell the Shares. However, Schwab's claim is contradicted by a letter, dated March 24, 2000, that it wrote to Plaintiffs which noted that "[b]efore we may accept your order to sell these shares, the enclosed paperwork should be completed and returned to us . . . ." (Id., Ex. D to Statement of Claims.) Indeed, while Schwab avers in the Response that Olga Ross ("Olga Ross"), a Schwab representative and no relation to Plaintiffs, finally completed the Forms on March 23 after gathering information from Mrs. Ross during multiple telephone conversations throughout the day, the exhibits—which consist of both the Form 144 and the Seller's Representation Letter—that Schwab attached to prove this fact are dated April 3, 2000 and April 6, 2000, respectively. Thus, the record indicates that the Forms were not fully completed until after March 23, and quite possibly not until April 6.

The record also shows that March 23 was the first time that Schwab contacted CIC to request approval for the sale of the Shares. Olga Ross, acting on the information provided by Mrs. Ross, contacted Frank Dane ("Dane"), counsel for CIC, to request his approval for sale of the Shares pursuant to Rule 144(k). Dane gave his approval verbally, and Olga Ross then left a message for Plaintiffs to report that CIC had given its verbal approval to sell the Shares. After leaving the message, Olga Ross placed the following note in a file for Plaintiffs' account: "3/23/00 OK to sell 72463 under R144K per Frank Dane @ company." (See Respondents' Statement of Answer, Motion to Dismiss, and Cross–Claim Against Communications Intelligence Corporation, dated August 27, 2001, attached as Ex. A2 to Notice, at 3.) Schwab notes that there is no record that Plaintiffs attempted to sell the Shares between March 23 and March 30, which seems logical considering the March 24 letter Schwab sent Plaintiffs noting that the Shares could not be sold until the Forms were completed.

On Thursday, March 30, 2000, Dane called Schwab and spoke with an unidentified employee. This time, Dane changed his previous answer and declared that the Shares were subject to a 90–day "lockup" agreement that prevented resale until June 1, 2000. That same day, Olga Ross called Mrs. Ross to inform her that the Forms—which Schwab had submitted to CIC—were rejected by CIC's outside counsel and, as a result, the Shares could not be sold at that time. After speaking with Olga Ross, Mrs. Ross contacted Dane, who told her that the Form submitted by Schwab had been rejected because it was the wrong form to process the sale of the restricted securities.[3] The Shares were

---

**3.** There is no reference on the record to any conversation between Mrs. Ross and Dane about the purported lockup agreement.

trading that day at $5.3125 per share, which equaled a total value of $384,959.68.

The following Monday, April 3, 2000, Olga Ross spoke with Dane again to clarify his March 30 message regarding the lockup agreement. The Shares on that day were valued at $5.125 per share, which equaled a total value of $371,372.87. Dane referred Olga Ross to Veronica Stork ("Stork"), the outside attorney who would be writing the opinion for issuer's counsel regarding the Shares. Stork told Olga Ross that the applicable lockup prevented sale of the Shares for only 30 days after their issuance, thus barring sale until March 31, 2000. Stork also asserted that from March 31 to June 1, the Shares could be sold only pursuant to Rule 144. That same day, Olga Ross called Mrs. Ross and informed her that she could now sell the Shares. Rather than sell the Shares at that point, Mrs. Ross complained to Olga Ross and another Schwab representative about the manner in which the Shares and Forms had been handled. Plaintiffs eventually entered a sell order for the Shares on May 19, 2000, at which point they were valued at $3.00 per share.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Under § 1332, in order for the court to exercise diversity jurisdiction over a case, the amount in controversy must exceed "the sum or value of $75,000, exclusive of interest and costs...." 28 U.S.C. § 1332(a) (2003). The amount in controversy requirement is met initially if plaintiff's good faith allegations establish that the amount in dispute is more than $75,000. *See Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 116 (2d Cir.2002). However, if the jurisdictional facts that support the amount in controversy are challenged, "the party asserting jurisdiction must support those facts with 'competent proof' and 'justify [its] allegations by a preponderance of

evidence.'" *United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Prop. Meriden Square, Inc.*, 30 F.3d 298, 305 (2d Cir.1994) (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). A court cannot dismiss a diversity action because of a jurisdictional amount deficiency unless it appears to a "legal certainty that the claim is really for less than the jurisdictional amount...." *Ocean Ships*, 315 F.3d at 115.

### B. JURISDICTIONAL AMOUNT

In deciding whether Plaintiffs are able to meet the jurisdictional amount in this action, the Court must assess at what point, if any, CIC could be found liable for the delay in selling the Shares. Plaintiffs assert that CIC is responsible for all damages they suffered from March 6, 2000, when Plaintiffs deposited the Certificate with Schwab, to April 3, 2000, when CIC advised Schwab that Plaintiffs could sell the Shares. They construct this claim based on the theory—first expounded by Schwab as a cross-claim in the Arbitration—that the sale of the Shares was delayed because CIC failed to provide Plaintiffs with adequate documentation regarding the restrictions on and how to sell the Shares.

CIC counters that, at the most, CIC may be liable for damages incurred between March 30, 2000, when Dane erroneously stated that the Shares could not be sold, and April 3, 2000, when Stork clarified that the Shares could be sold immediately. The price per Share during this period declined from $5.3125 to $5.125, a difference of 18.75 cents, which translates into total damages of $13,586.81—far below the minimum mandated by § 1332.

The record developed before, during and after the Hearing supports CIC's conten-

tions. Plaintiffs have not provided any "competent proof" to demonstrate how CIC should be liable for any of the delays in the sale of the Shares that occurred before March 30. Instead, the record indicates that CIC properly sent Plaintiffs the Letter explaining a possible exemption under which to sell the Shares and the Certificate, which Mrs. Ross then promptly took to Schwab's branch office in order to sell the Shares. Schwab is a sophisticated firm that handles the accounts of a significant number of individual investors, and there is no indication on the record that Mrs. Ross's attempt to sell the Shares amounted to anything more than a routine request of a type that Schwab undoubtedly had processed many times before.

Indeed, Schwab responded to Mrs. Ross's request by giving her the Forms—which were pre-printed documents created by Schwab and presumably used by Schwab in the course of similar Rule 144 transactions with other Schwab customers—to complete in order to effect the sale. The existence of the Forms, which appear from their language and structure to have been reviewed by legal counsel and which are embossed with Schwab's name, demonstrates that Schwab was already prepared with materials to receive and process Rule 144 sales requests. Plaintiffs have not persuaded the Court that CIC should or even could have better instructed Mrs. Ross on how to enter her sell order or that CIC needed to provide her with additional forms in order to process the order. In fact, when Plaintiffs finally entered a sell order for the Shares on May 19, 2000, there is no evidence on the record that the order required any additional documents from CIC.

There is also no evidence on the record before the Court that CIC had anything to do with the numerous conflicting responses Plaintiffs allege Schwab gave them to explain why the Shares were not being sold.

Indeed, on March 23, Dane gave his verbal approval for the sale of the Shares, which presumably could have proceeded at that time if Schwab had properly handled the Forms and the Certificate. Thus, the Court finds, consistent with Plaintiffs' own observations, that Schwab's theory of liability against CIC seems implausible. (See Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, dated May 27, 2003, at 1) ("[P]laintiffs do not ascribe significant credibility to the Schwab theory of liability against CIC....")

The only period during which Plaintiffs can reasonably contend that CIC hindered the sale of the Shares extends from March 30, 2000, when Dane mistakenly asserted that the Shares were subject to a non-existent lockup agreement, to April 3, 2000, when Stork clarified that the applicable lockup was of more limited duration and that the Shares could then be sold. As mentioned previously, even if Plaintiffs were able to prove that CIC was responsible for the delay in the sale of the Shares during this period, the damages would amount to only $13,586.81, a total that falls below the amount required by § 1332. Thus, Plaintiffs fail to allege facts sufficient to meet the amount in controversy requirement necessary to sustain subject matter jurisdiction before this Court.

### III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Court's Order dated June 20, 2003 in this action is amended to incorporate the discussion set forth herein; and it is further

**ORDERED** that Defendant Communication Intelligence Corporation's motion to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(1) is granted; and it is further

**ORDERED** that Plaintiffs Richard M. Ross and Jane Spaulder Ross's complaint, Docket No. 02 Civ. 6197, is dismissed.

The Clerk of Court is directed to close this case.

**SO ORDERED.**